IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ROME DIVISION

UNITED STATES OF AMERICA

v.

JOHN GREGORY ALVAREZ,

Defendant.

CRIMINAL ACTION FILE
NO.  4:10-CR-32-HLM-WEJ-1

## NON-FINAL REPORT AND RECOMMENDATION

This matter is before the Court on defendant John Gregory Alvarez's Motion to Suppress Statements [33].  On November 11, 2010, the Court conducted an evidentiary hearing [43] regarding the instant Motion, which has been transcribed [45].  The parties have briefed the matter.  (See Br. Supp. Mot. Supp. Statements [48] ("Def.'s Br."); Gov't Resp. [50]; Def.'s Reply [91].)  On the basis of the testimony and evidence produced at that hearing, the undersigned **REPORTS** that police provided Mr. Alvarez with a Miranda warning; he in turn voluntarily and knowingly waived his Miranda rights and made statements to police while in his residence. Moreover, Mr. Alvarez made additional voluntary statements to police while in

AO 72A
(Rev.8/8
2)

transit to the Floyd County Jail.  Therefore, the undersigned **RECOMMENDS** that defendant's Motion to Suppress Statements [33] be **DENIED**.

I.     **STATEMENT OF FACTS**

    A.     **Execution of the Search Warrant**

At approximately 7:00 a.m. on June 30, 2010, a team of six Drug Enforcement Administration ("DEA") agents and local law enforcement officers executed a search warrant at Mr. Alvarez's residence–25 East Lakeview Drive, Rossville, Georgia. (Nov. 10, 2010, Hr'g Tr. [45] ("Tr.") 5-6, 10-11, 18-20, 24, 26, 39-40.)  That search warrant was one of four the DEA executed that day in an ongoing investigation into alleged narcotics trafficking by Mr. Alvarez.  (Id. at 6, 23-25.)[1]

Three officers, including Walker County Deputy Sheriff Donald Brown, entered and secured Mr. Alvarez's residence.  (Tr. 8-10, 19, 59, 71.)[2]  The officers forced entry through a locked screen door on the residence's back porch.  (Id. at 6-7,

─────────────────────

[1] While those warrants were being executed, DEA Special Agent ("SA") Christopher Mueller (the co-case agent assigned to this case) was waiting at a strip mall in Rossville.  (Tr. 25.)  Once he learned that the four warrants had been executed, he drove to Mr. Alvarez's residence.  (Id.)  At the time, Mr. Alvarez was the main suspect of the investigation.  (Id. at 26.)

[2] All the officers carried firearms and wore raid jackets or ballistic vests identifying themselves as law enforcement.  (Tr. 8-10, 59.)

28, 55, 57, 59, 71.)  As the officers approached the home's back door announcing "Sheriff's office, search warrant,"  Mr. Alvarez opened the door and the officers ordered him to the floor.  (<u>Id.</u> at 57-61, 71.)  One officer remained with Mr. Alvarez while Deputy Brown and another officer secured the home.  (<u>Id.</u> at 7, 58, 60.)  Mr. Alvarez's wife, Comneta, was also in the  residence.  (<u>Id.</u> at 62.)

After approximately three to five minutes, the initial entry team had secured the residence and opened its front door so that SA Frank Ledford and SA David Shelton (who had been monitoring that entrance) could assist inside the home.  (Tr. 6-8, 10, 20, 57, 63.)  SA Shelton was wearing a ballistic vest with the word "Police" across the chest and a badge patch.  (<u>Id.</u> at 8-9.)  He was armed with a 40-caliber Glock pistol, but did not unholster it while in the residence.  (<u>Id.</u> at 9.)

**B.    <u>Mr. Alvarez's Statements While in His Residence</u>**

As he entered the home, SA Shelton observed Mr. Alvarez and his wife seated on reclining chairs in the living room with a uniformed member of the raid team (Deputy Brown) observing them.  (Tr. 8, 11-12, 20, 60-64, 71-72.)[3] Mr. Alvarez was shirtless and wearing pajamas or underwear, and both he and his wife had a blanket

---

[3] Deputy Brown testified that he did not interrogate Mr. Alvarez at that time. (Tr. 64.)

AO 72A
(Rev.8/8
2)

or sheet pulled around them like a shawl.  (Id. at 12, 21-22, 29, 40, 63, 72.)
Additionally, they were handcuffed in front.  (Id. at 20, 29, 40.)

Mr. Alvarez expressed his concern about the morning's events to SA Shelton and, in a polite, conversational manner, asked what was going on, what the officers were looking for, and why they came to his house.  (Tr. 13, 18, 62-63.)[4]  Mr. Alvarez also told SA Shelton that he had taken ten oxycodone pills the previous night.  (Id. at 21).  According to SA Shelton, Mr. Alvarez did not appear ill or intoxicated, but was acting lethargic or tired.  (Id. at 13.)  SA Shelton told Mr. Alvarez that he did not have the answers to those questions because he had not been involved in the investigation and explained that the case agent would arrive soon and could speak with Mr. Alvarez.  (Id. at 14.)  SA Shelton then advised Mr. Alvarez of his Miranda rights by reciting them from memory as follows:

> You have the right to remain silent.  Anything you say could be used against you.  You have the right to an attorney and to have an attorney present.  If you cannot afford an attorney, one will be appointed for you.  If you decide to answer questions now and at any time decide you don't want to answer questions anymore, nobody will ask you questions.

---

[4] SA Shelton characterized Mr. Alvarez's ability to speak English as "coherent and conversational."  (Tr. 13.)

4

(Id. at 14-15; see also id. at 72, 77.)  According to SA Shelton, he then paraphrased those rights by explaining, "It means you don't have to say anything unless you want to, do you understand." (Id. at 15-16.)  Mr. Alvarez said, "Yeah, I understand I just want to know what's going on." (Id.)  Mr. Alvarez did not ask SA Shelton to repeat any of the above rights. (Id. at 15.)  Deputy Brown was present while SA Shelton Mirandized Mr. Alvarez. (Id. at 16, 63-64.)[5]

SA Shelton did not interrogate Mr. Alvarez, but engaged him in small talk regarding his dogs. (Tr. 16.)  Ten or twenty minutes after officers initially entered Mr. Alvarez's residence, SA Mueller arrived with SA David Gilleland. (Id. at 17, 19, 26, 28, 39, 64.)  SA Mueller's badge was visible, but did not brandish his firearm. (Id. at 28-29.)  At that time, SA Shelton told Mr. Alvarez that "[SA Mueller is] the guy that can answer your questions." (Id. at 17.)  Mr. Alvarez and his wife were still seated in the reclining chairs with Deputy Brown observing them. (Id. at 27-29, 40.)

_____

[5] Deputy Brown testified that SA Shelton read the Miranda rights to Mr. Alvarez from a card. (Tr. 63, 73.)  This inconsistency is inconsequential as the testimony reflects that SA Shelton administered the Miranda rights to Mr. Alvarez and defendant does not dispute that fact. (See generally Def.'s Br.)

In his experience as a law enforcement officer, SA Mueller has interacted with people under the influence of prescription narcotics. (Tr. 30-31, 54-55.) SA Mueller knew that Mr. Alvarez had taken ten 30-milligram oxycodone pills the previous night. (Id. at 13, 21, 30-31, 41.)[6] According to SA Mueller, the effect that amount of narcotics would have on someone would depend on the person's level of addiction. (Id. at 30.) SA Mueller explained that phenomenon as follows: "So if a person doesn't take a certain drug and then takes a lot of it, it can have a different adverse effect on them than if a person is an addict and sustains their habit with large amounts of drugs." (Id.) He also testified that someone who has taken oxycodone should not drive or operate heavy machinery and that an overdose of oxycodone could be lethal, cause suppressed respiration, and slow thinking. (Id. at 30, 42-43.)

According to SA Mueller, Mr. Alvarez was responsive, alert, awake, and "obviously acting confused, maybe sullen that law enforcement was in his house." (Tr. 30-31.) SA Mueller testified that Mr. Alvarez did not appear intoxicated, did not slur his speech, was consistently conscious, did not fall asleep, did not pass out, and was able to comprehend what was being said and focus on the questions asked.

---

[6] SA Mueller testified that a new patient should only take a 30-milligram dose of oxycodone every four hours, and an extended release pill every twelve hours. (Tr. 43.)

6

(<u>Id.</u> at 31, 52, 54.)  According to SA Mueller, Mr. and Mrs. Alvarez appeared to be in poor physical condition; Mr. Alvarez complained in general terms that he was not feeling well and stated that he thought he was passing a kidney stone.  (<u>Id.</u> at 40, 73.) However, Mr. Alvarez never asked SA Mueller to stop questioning him due to pain. (<u>Id.</u> at 52.)  According to SA Mueller, Mr. Alvarez's pain did not appear to interfere with his ability to answer questions.  (<u>Id.</u>)  Mr. Alvarez did not ask for medical attention, and was not writhing in pain, doubled over, visibly shaken, or frightened; he merely laid in the recliner.  (<u>Id.</u> at 52-53, 63.)

SA Mueller introduced himself to Mr. and Mrs. Alvarez and immediately asked Mr. Alvarez if there was any methamphetamine in the home. (Tr. 29, 43.) Mr. Alvarez replied that there was not.  (<u>Id.</u>)  SA Mueller turned to SA Shelton and asked if Mr. Alvarez and his wife had been Mirandized; SA Shelton answered in the affirmative.  (<u>Id.</u>)  SA Mueller briefly conversed with Mr. Alvarez, who was alert and responsive, and also interacted with Mrs. Alvarez.  (<u>Id.</u> at 32.)  Mr. Alvarez did not ask SA Mueller to repeat himself.  (<u>Id.</u>)  Regarding that conversation, SA Mueller testified as follows: "I reemphasized certain points, but I didn't have to say things again because he didn't understand me or didn't hear me."  (<u>Id.</u>)

7

During the course of their conversation, Mr. Alvarez told SA Mueller that he was "bad with last names." (Tr. 44.) SA Mueller believed that Mr. Alvarez was not being truthful as to whether he knew certain individuals. (Id. at 32.) Because Mrs. Alvarez was being more forthright, SA Mueller separated the two, moving her to an adjoining room eight to ten feet behind where Mr. Alvarez was seated for additional questioning. (Id. at 32-34, 48.)

When SA Mueller resumed questioning Mr. Alvarez, he commented about a specific detail of the investigation; Mr. Alvarez responded to that comment and then requested an attorney. (Tr. 34, 49.) SA Mueller stopped questioning Mr. Alvarez, brought Mrs. Alvarez back into the living room, and made a telephone call. (Id. at 34.) Mr. Alvarez remained in the living room for approximately one hour before being transported to the Walker County Sheriff's Office at 8:30 a.m. (Id. at 34-35, 50, 64-65.) Law enforcement did not ask Mr. Alvarez any further investigative questions during that time. (Id. at 35.)

No threats or promises were made to Mr. or Mrs. Alvarez during the above events, and they were not yelled at or treated inhumanely. (Tr. 17-18, 34, 36-37.) Additionally, during the course of the above interactions, Mr. Alvarez requested a

8

T-shirt and a Zantac.  (Id. at 35-36, 46, 51-52.)  SA Mueller complied with those requests.  (Id. at 36, 46, 52.)

### C.    Mr. Alvarez's Statements While Being Transported

On June 30, 2010, at approximately 3:00 p.m., Deputy Brown transported Mr. Alvarez from the Walker County Sheriff's Office to the Floyd County Jail.  (Tr. 35, 64-65, 74.)[7]  Deputy Brown handcuffed Mr. Alvarez in the front and placed him into a patrol car for the fifty-minute drive.  (Id. at 65-66, 74.)  During that time, Deputy Brown and Mr. Alvarez were separated by a metal screen between the patrol car's front and rear seats.  (Id. at 66.)

Ten minutes into the drive, Mr. Alvarez began making unsolicited, unprompted statements to Deputy Brown every five to eight minutes.  (Tr. 67, 69.)[8] Mr. Alvarez asked Deputy Brown about Mrs. Alvarez, his animals, other people, and his property.  (Id. at 67, 69, 74-75.)  Mr. Alvarez also referenced another patrol car driving six to seven car lengths ahead of Deputy Brown.  (Id. at 68.)  Deputy Brown

---

[7] SA Mueller instructed Deputy Brown to transport Mr. Alvarez to the Floyd County Jail because the DEA has a contract with the Jail to house federal defendants. (Tr. 35, 65.)

[8] Police radio traffic was audible during the drive; however, Mr. Alvarez's comments were not prompted by information coming over the radio.  (Tr. 67.)

AO 72A
(Rev.8/8
2)

answered Mr. Alvarez's questions, but did not re-Mirandize him.  (Id. at 74-75.)

During the trip, Mr. Alvarez asked Deputy Brown if he had gone to Gerald's house;

Deputy Brown responded, "Gerald who?"  (Id. at 76-78.)

Deputy Brown characterized Mr. Alvarez's demeanor during the drive as curious and testified that Mr. Alvarez did not appear intoxicated, ill, sick, or sleepy. (Tr. 68-69.)  During the trip, however, Mr. Alvarez alternated between sitting and laying on the back seat.  (Id. at 74.)  Additionally, while transporting Mr. Alvarez, Deputy Brown did not point a firearm at him, drive erratically, threaten or yell at him, make any promises to him, treat him inhumanely, or ask him additional questions.  (Id. at 68-70.)

## II.     **THE CHARGING DOCUMENT**

On July 20, 2010, the grand jury returned a five-count Indictment with a forfeiture provision [16] against Mr. Alvarez and his co-defendant, Jesse Wilburn Peardon, concerning conduct allegedly occurring in this District.[9]  Count One alleges that, at least by June 1, 2005, and continuing up to and including June 30, 2010, Mr. Alvarez and Mr. Peardon knowingly conspired to possess with intent to distribute

---

[9] Counts Two and Five of the Indictment only concern Mr. Peardon; thus, they are not relevant to Mr. Alvarez or his pending Motion to Suppress Statements.  (See Indictment Counts Two & Five.)

AO 72A
(Rev.8/8
2)

oxycodone in violation of 21 U.S.C. §§ 841(a)(1), 841(b)(1)(C), and 846. (Indictment Count One.)  Count Three charges that, on or about May 27, 2010, the co-defendants, aided and abetted by each other, knowingly distributed oxycodone in violation of 18 U.S.C. § 2 and 21 U.S.C. §§ 841(a)(1), 841(b)(1)(C), and 846. (Indictment Count Three.)  Finally, Count Four charges that, on or about June 15, 2010, the co-defendants, aided and abetted by each other, knowingly distributed oxycodone in violation of 18 U.S.C. § 2 and 21 U.S.C. §§ 841(a)(1), 841(b)(1)(C), and 846.  (Indictment Count Four.)

## III.   **CONTENTIONS OF THE PARTIES**

Mr. Alvarez asserts that his June 30, 2010 statements to law enforcement officers (made at his home and while being transported) must be suppressed.  (See generally Def.'s Br.)  He argues that, while at his home, he was under the influence of oxycodone and in poor health; therefore, he could not knowingly and intelligently waive his Miranda rights.  (Id. at 6-8.)  Likewise, Mr. Alvarez contends that his subsequent statements were not voluntary.  (Id.)  Additionally, he argues that, after asserting his Fifth Amendment right to counsel, he was subjected to additional interrogation while being transported to the Floyd County Jail.  (Id. at 8-10.)

AO 72A
(Rev.8/8
2)

The Government responds that SA Shelton provided a Miranda warning to Mr. Alvarez, that Mr. Alvarez knowingly and voluntarily waived his right to remain silent and, after invoking his right to counsel, later volunteered statements without additional police interrogation. (Gov't Br. 11-20.) Furthermore, the Government asserts that any inculpatory statements by him were free and voluntarily and should not be suppressed. (Id. at 20-21.)

## IV.  ADMISSIBILITY OF INCRIMINATING STATEMENTS

Before a defendant's confession or self incriminating statements may be presented to a jury, a defendant has a constitutional right to a fair hearing and an independent and reliable determination of the voluntariness of those statements. Jackson v. Denno, 378 U.S. 368, 376-77 (1964). Pursuant to 18 U.S.C. § 3501(a) "the trial judge shall, out of the presence of the jury, determine any issue as to voluntariness." United States v. Davidson, 768 F.2d 1266, 1270 n.1 (11th Cir. 1985) (explaining that § 3501(a) codified Jackson v. Denno requirement for criminal prosecutions).

In Miranda v. Arizona, 384 U.S. 436 (1966), the Supreme Court noted that, "when an individual is taken into custody or otherwise deprived of his freedom by the authorities in any significant way and is subjected to questioning, the privilege

AO 72A
(Rev.8/8
2)

against self-incrimination is jeopardized." 384 U.S. at 478. Therefore, the Court held that the procedural safeguard of warning the suspect of his constitutional rights must be instituted to protect the privilege. Id. at 478-79. These so-called Miranda warnings "are required before any statement may be admitted into evidence at trial which was elicited from a person in custody through interrogation." Endress v. Dugger, 880 F.2d 1244, 1248 (11th Cir. 1989). A two-part inquiry determines the admissibility of a confession or self-incriminating statement. Courts making a determination on the validity of a defendant's waiver of his Miranda rights may find such a waiver valid only if the totality of the circumstances show both of the following: (1) an uncoerced choice and (2) an awareness "of both the nature of the right being abandoned and the consequences of the decision to abandon it." Moran v. Burbine, 475 U.S. 412, 421 (1986).

Furthermore, even where the Government has complied with the requirements of Miranda, the Court must consider whether the confession or self-incriminating statement was voluntary. United States v. Jones, 32 F.3d 1512, 1516 (11th Cir. 1994) (per curiam); United States v. Sims, 719 F.2d 375, 378 (11th Cir. 1983) (per curiam). To determine whether statements were voluntary, the Court must examine the "totality of the circumstances, including the details of the interrogation and the

AO 72A
(Rev.8/8
2)

defendant's characteristics." United States v. Bernal-Benitez, 594 F.3d 1303, 1319 (11th Cir. 2010).   The goal of that inquiry is to determine whether police overreached, considering factors such as "the [accused's] lack of education, or his low intelligence, the lack of any advice to the accused of his constitutional rights, the length of detention, the repeated and prolonged nature of the questioning, and the use of physical punishment such as the deprivation of food or sleep." Id.   (internal quotations and citations omitted) (alteration in original).

However, voluntary incriminating statements not made in response to custodial interrogation[10] are admissible.  See Innis, 446 U.S. at 299-300; United States v. Canela, 144 F. App'x 17, 22 (11th Cir. 2005) (per curiam); United States v. Suggs, 755 F.2d 1538, 1541 (11th Cir 1985).  Likewise, Miranda is not implicated where an officer responds to a defendant's voluntary statement by asking for clarification.  United States v. Villegas-Tello, 319 F. App'x 871, 875-76 (11th Cir. 2009) (per curiam).

---

[10]   Interrogation is defined as express questioning or the functional equivalent–"any words or actions on the part of the police . . . that the police should know are reasonably likely to elicit an incriminating response." Rhode Island v. Innis, 446 U.S. 291, 300-01 (1980).

AO 72A
(Rev.8/8
2)

## V.   ANALYSIS

The Court first determines whether Mr. Alvarez knowingly and intelligently waived his Miranda rights and whether his subsequent statements to police (made in his home) were voluntary.  The Court then examines whether Mr. Alvarez's later statements (made in transit to the Jail) were voluntary, or the product of additional interrogation by Deputy Brown.

### A.   Defendant's Miranda Waiver and Statements in his Home

It is undisputed that the first Miranda prong was satisfied.  Mr. Alvarez does not argue that law enforcement failed to give him a Miranda warning or that his waiver was coerced.[11]  Rather, Mr. Alvarez argues that the second prong was not met because he could not have knowingly and intelligently waived his rights while under the influence of drugs and in pain.  For those same reasons, he also contends that his subsequent statements in his home were involuntary.

-------------------------------------------------------

[11] The hearing testimony supports defendant's concession that the first Miranda prong was met.  The testimony reflects that, prior to any questioning, SA Shelton orally provided a Miranda warning to Mr. Alvarez and summarized those rights in plain language in the presence of Deputy Brown.  (Tr. 14-16, 63-64.) Moreover, no officer made any threats or promises to Mr. Alvarez, yelled at or treated him inhumanely, or brandished a weapon after the residence was secured. (Id. at 9, 14-18, 34, 36-37.)

15

The test of whether a person is too affected by alcohol, drugs, or pain to voluntarily and intelligently waive his Miranda rights is one of coherence and an understanding of what is happening.  See United State v. Martin, 434 F.2d 275, 279 (5th Cir. 1979) (holding confession properly admissible where evidence supported finding that, while defendant had been drinking and was affected by alcohol to some degree, he was coherent and understood was happening)[12]; see also United States v. Adamson, No. 04-672, 2008 WL 167299, at *7 (E.D. Pa. Jan. 16, 2008) (collecting circuit court cases focusing on defendant's coherence and comprehension, and finding that anxiety and pain medication did not impair the defendant's ability to make a valid Miranda waiver).

Here, despite Mr. Alvarez's ingestion of oxycodone the previous night and his pain, the hearing testimony supports a finding that he was coherent and cognizant of the situation when he waived his Miranda rights and spoke with SA Mueller.  Mr. Alvarez was alert and awake when the officers entered his home at 7:00 a.m. on June 30, 2010, opening the back door of the residence as officers approached.  After being moved to the living room, Mr. Alvarez asked SA Shelton in a polite, conversational

---

[12] The Eleventh Circuit has adopted as binding precedent all Fifth Circuit decisions handed down before the close of business on September 30, 1981. Bonner v. City of Prichard, 661 F.2d 1206 (11th Cir. 1981) (en banc).

AO 72A
(Rev.8/8
2)

manner what was going on, what the officers were looking for, and why they came to his home.  (See Tr. 13, 18, 57-61, 62-63, 71.)    Although the hearing testimony revealed that Mr. Alvarez was in poor physical health, he was consistently conscious and did not appear intoxicated, slur his speech, fall asleep, or pass out.  (Id. at 13, 31, 40, 52, 54, 73.)

Moreover, after SA Shelton administered the Miranda rights, Mr. Alvarez stated that he understood his rights and repeated his desire to "know what's going on."  (Tr. 15-16.)  Mr. Alvarez's express oral statement waiving those rights is "strong proof of the validity of that waiver."  See North Carolina v. Butler, 411 U.S. 369, 373 (1979).  Likewise, when SA Mueller arrived ten to twenty minutes later, Mr. Alvarez was able to focus on the questions asked and to respond with coherent answers.  (Tr. 31, 52, 54.)  Although Mr. Alvarez complained in general terms that he was not feeling well and thought that he was passing a kidney stone, he did not ask SA Mueller to stop the questioning or request medical attention.  (Id. at 40, 52-53, 63, 73.)  Rather, he asked for a T-shirt and a Zantac, both of which SA Mueller gave to Mr. Alvarez.  (Id. at 35-36, 46, 51-52.)  Moreover, after conversing with SA Mueller for approximately ten minutes, Mr. Alvarez invoked his right to counsel and stopped the interrogation.  (Id. at 34, 49.)

17

The undersigned accepts SA Mueller's testimony that narcotics have varying effects on people depending on their individual drug history.   (See Tr. 30.) However, there is no probative evidence that Mr. Alvarez's statements were involuntary.  Without more, Mr. Alvarez's contention that he ingested oxycodone the previous evening and was in pain does not invalidate his Miranda waiver or make his subsequent statements involuntary.  Indeed, by invoking his right to remain silent and his right to counsel, Mr. Alvarez demonstrated that he understood the Miranda warning and was cognizant of the situation, ending his conversation with SA Mueller when it suited him.

Therefore, considering the totality of the circumstances, Mr. Alvarez made a knowing, voluntary, and intelligent waiver of his Miranda rights, followed by voluntary statements to SA Mueller.   Accordingly, the undersigned **RECOMMENDS DENYING** defendant's Motion to Suppress as to his statements made while at his residence.

AO 72A
(Rev.8/8
2)

B.     **Defendant's Statements in Transit**

After Mr. Alvarez was taken into custody, Deputy Brown transported him from the Walker County Sheriff's Office to the Floyd County Jail, a fifty-minute drive.  (Tr. 35, 64-65, 74.)  During that time, Mr. Alvarez repeatedly made unsolicited statements to and voluntarily asked questions of Deputy Brown (which Deputy Brown answered).  (Id. at 67, 69, 74-75.)  At some point, Mr. Alvarez asked Deputy Brown if the officers had gone to Gerald's house.  (Id. at 76-78.)  Deputy Brown responded by asking Mr. Alvarez, "Gerald who?"  (Id.)

There is no dispute that Mr. Alvarez was in custody at the time and that he had invoked his right to remain silent and to counsel.  However, voluntary comments in the absence of, or unresponsive to, law enforcement questioning are admissible even after Miranda rights are asserted.  See Miranda, 384 U.S. at 478; Suggs, 755 F.2d at 1541-42. Here, Mr. Alvarez's post-arrest statements and questions were spontaneous and not in response to interrogation by Deputy Brown.  Additionally, Deputy Brown's single question–"Gerald who?"–cannot be characterized as an interrogation or an attempt to elicit an incriminating response from Mr. Alvarez.  Rather, it appears to be a reflexive follow-up question asked for the sake of clarification.  The Eleventh Circuit has held that Miranda does not reach such situations.  See Villegas-Tello, 319

F. App'x 875-77; <u>see also</u> <u>United States v. McQuagge</u>, 787 F. Supp. 637, 658-59 (E.D. Tex. 1991) (finding officer's initial clarifying questions made in response to defendant's spontaneous statement and after defendant had invoked right to counsel was not interrogation); <u>Papile v. Hernandez</u>, 697 F. Supp. 626, 629-31 (E.D.N.Y. 1988) (same).   Accordingly, the undersigned **RECOMMENDS DENYING** defendant's Motion to Suppress as to his statements made while in transit to the Floyd County Jail.

**VI.   <u>CONCLUSION</u>**

For the reasons stated above, the undersigned **RECOMMENDS** that defendant's Motion to Suppress Statements [33] be **DENIED**.

**SO RECOMMENDED**, this 4th day of February, 2011.


WALTER E. JOHNSON
UNITED STATES MAGISTRATE JUDGE

20

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ROME DIVISION

UNITED STATES OF AMERICA

v.

JOHN GREGORY ALVAREZ,

Defendant.

CRIMINAL ACTION FILE
NO. 4:10-CR-32-HLM-WEJ-1

## ORDER FOR SERVICE OF
## NON-FINAL REPORT AND RECOMMENDATION

Let this Non-Final Report and Recommendation of the United States
Magistrate Judge, made in accordance with 28 U.S.C. § 636(b)(1)(B) and the Court's
Local Criminal Rule 58.1(A)(3)(a), be filed and a copy, together with a copy of this
Order, be served upon counsel for the parties.

Pursuant to 28 U.S.C. § 636(b)(1), each party may file written objections, if
any, to the Non-Final Report and Recommendation within fourteen days of the
receipt of this Order.  Should objections be filed, they shall specify with particularity
the alleged error(s) made (including reference by page number to any transcripts if
applicable) and shall be served upon the opposing party.  The party filing objections
will be responsible for obtaining and filing the transcript of any evidentiary hearing

for review by the District Court.  If no objections are filed, the Non-Final Report and

Recommendation may be adopted as the opinion and order of the District Court, and

any appellate review of factual findings will be limited to a plain error review.

United States v. Slay, 714 F.2d 1093, 1095 (11th Cir. 1983) (per curiam).

The Clerk is directed to submit the Non-Final Report and Recommendation

with objections, if any, to the District Court after expiration of the above time period.


**SO ORDERED**, this 4th day of February, 2011.



WALTER E. JOHNSON
UNITED STATES MAGISTRATE JUDGE

2