# IN THE UNITED STATES DISTRICT COURT FOR THE NORTHERN DISTRICT OF GEORGIA ROME DIVISION

UNITED STATES OF
AMERICA

v.

JOHN GREGORY
ALVAREZ.

CRIMINAL ACTION FILE
NO. 4:10-CR-32-01-HLM

## ORDER

This case is before the Court on Defendant's Motion to

Suppress Statements [33], on the Non-Final Report and

Recommendation of United States Magistrate Judge Walter

E. Johnson [114], and on Defendant's Objections to the

Non-Final Report and Recommendation [120].

## I. Standard of Review for a Report and Recommendation

28 U.S.C.A. § 636(b)(1) requires that in reviewing a magistrate judge's report and recommendation, the district court "shall make a de novo determination of those portions of the report or specified proposed findings or recommendations to which objection is made." 28 U.S.C.A. § 636(b)(1). The Court therefore must conduct a de novo review if a party files "a proper, specific objection" to a factual finding contained in the report and recommendation. Macort v. Prem. Inc., 208 F. App'x 781, 784 (11th Cir. 2006); Jeffrey S. by Ernest S. v. State Bd. of Educ., 896 F.2d 507, 513 (11th Cir. 1990); United States v. Gaddy, 894 F.2d 1307, 1315 (11th Cir. 1990); LoConte v. Dugger, 847 F.2d 745, 750 (11th Cir. 1988). If no party files a timely

2

objection to a factual finding in the report and recommendation, the Court reviews that finding for clear error. Macort, 208 F. App'x at 784. Legal conclusions, of course, are subject to de novo review regardless of whether a party specifically objects. United States v. Keel, 164 F. App'x 958, 961 (11th Cir. 2006); United States v. Warren, 687 F.2d 347, 347 (11th Cir. 1982).

## I. Background

### A. Execution of the Search Warrant

At approximately 7:00 a.m. on June 30, 2010, a team of six Drug Enforcement Administration ("DEA") agents and local law enforcement officers executed a search warrant at Defendant's residence, located at 5 East Lakeview Drive, Rossville, Georgia (the "Residence"). (Nov. 10, 2010, Hr'g

3

Tr. ("Tr.") at 5-6, 10-11, 18-20, 24, 26, 39-40.) That search warrant was one of four the DEA executed on that same day as part of an ongoing investigation into alleged narcotics trafficking by Defendant. (Id. at 6, 23-25.)[1]

Three officers, including Walker County Deputy Sheriff Donald Brown, entered and secured the Residence. (Tr. 8-10, 19, 59, 71.)[2] The officers forced entry into the Residence through a locked screen door on the Residence's back porch. (Id. at 6-7, 28, 55, 57, 59, 71.) As

---

[1]While other officers executed the warrants, DEA Special Agent ("SA") Christopher Mueller, who is the co-case agent assigned to this case, was waiting at a strip mall in Rossville. (Tr. 25.) Once SA Mueller learned that the four warrants had been executed, he drove to the Residence. (Id.) At the time, Defendant was the main suspect of the investigation. (Id. at 26.)

[2]All the officers carried firearms and wore raid jackets or ballistic vests identifying themselves as law enforcement. (Tr. at 8-10, 59.)

4

the officers approached the Residence's back door, announcing "Sheriff's office, search warrant," Defendant opened the door, and the officers ordered him to the floor. (Id. at 57-61, 71.) One officer remained with Defendant while Deputy Brown and another officer secured the Residence. (Id. at 7, 58, 60.) Defendant's wife, Comneta, was also in the Residence. (Id. at 62.)

After approximately three to five minutes, the initial entry team had secured the Residence and opened its front door so that SA Frank Ledford and SA David Shelton, who had been monitoring that entrance, could assist inside the Residence. (Tr. 6-8, 10, 20, 57, 63.) SA Shelton was wearing a ballistic vest with the word "Police" across the chest and a badge patch. (Id. at 8-9.) SA Shelton was

5

armed with a 40-caliber Glock pistol, but did not unholster it while in the Residence. (Id. at 9.)

## B. Defendant's Statements While in the Residence

As SA Shelton entered the Residence, SA Shelton observed Defendant and his wife seated on reclining chairs in the living room, with a uniformed member of the raid team, Deputy Brown, observing them. (Tr. at 8, 11-12, 20, 60-64, 71-72.)[3] Defendant was shirtless and wearing pajamas or underwear, and both Defendant and his wife had a blanket or sheet pulled around them like a shawl. (Id. at 12, 21-22, 29, 40, 63, 72.) Additionally, both Defendant and his wife were handcuffed in front. (Id. at 20, 29, 40.)

---

[3]Deputy Brown testified that he did not interrogate Defendant at that time. (Tr. at 64.)

6

Defendant expressed his concern about the morning's events to SA Shelton and, in a polite, conversational manner, asked what was going on, what the officers were looking for, and why the officers came to his house. (Tr. at 13, 18, 62-63.)[4] Defendant also told SA Shelton that Defendant had taken ten oxycodone pills on the previous night. (Id. at 21). According to SA Shelton, Defendant did not appear ill or intoxicated, but was acting lethargic or tired. (Id. at 13.) SA Shelton told Defendant that SA Shelton did not have the answers to those questions because he had not been involved in the investigation, and explained that the case agent would arrive soon and could speak with Defendant. (Id. at 14.) SA Shelton then advised Defendant

[4]SA Shelton described Defendant's ability to speak English as "coherent and conversational." (Tr. at 13.)

of his Miranda rights by reciting those rights from memory

as follows:

> You have the right to remain silent. Anything you say could be used against you. You have the right to an attorney and to have an attorney present. If you cannot afford an attorney, one will be appointed for you. If you decide to answer questions now and at any time decide you don't want to answer questions anymore, nobody will ask you questions.

(Id. at 14-15, 72, 77.) According to SA Shelton, he then

paraphrased those rights by explaining, "It means you don't

have to say anything unless you want to, do you

understand[?]" (Id. at 15-16.) Defendant stated, "Yeah, I

understand I just want to know what's going on." (Id.)

Defendant did not ask SA Shelton to repeat any of the

above rights. (Id. at 15.) Deputy Brown was present while SA Shelton Mirandized Defendant. (Id. at 16, 63-64.)[5]

SA Shelton did not interrogate Defendant, but engaged him in small talk regarding his dogs. (Tr. at 16.) Ten or twenty minutes after officers initially entered the Residence, SA Mueller arrived with SA David Gilleland. (Id. at 17, 19, 26, 28, 39, 64.) SA Mueller's badge was visible, but he did not brandish his firearm. (Id. at 28-29.) At that time, SA Shelton told Defendant that "[SA Mueller is] the guy that can answer your questions." (Id. at 17.) Defendant and his wife

---

[5]Deputy Brown, however, testified that SA Shelton read the Miranda rights to Defendant from a card. (Tr. at 63, 73.) The Court agrees with Judge Johnson that this inconsistency is inconsequential, because the testimony in the record reflects that SA Shelton administered the Miranda rights to Defendant, and Defendant does not dispute that fact. (Non-Final Report & Recommendation at 5 n.5.)

9

were still seated in the reclining chairs, with Deputy Brown observing them. (Id. at 27-29, 40.)

In his experience as a law enforcement officer, SA Mueller has interacted with people who were under the influence of prescription narcotics. (Tr. at 30-31, 54-55.) SA Mueller knew that Defendant had taken ten 30-milligram oxycodone pills the previous night. (Id. at 13, 21, 30-31, 41.)[6] According to SA Mueller, the effect that this amount of narcotics would have on someone would depend on the person's level of addiction. (Id. at 30.) SA Mueller explained that phenomenon as follows: "So if a person doesn't take a certain drug and then takes a lot of it, it can

---

[6]SA Mueller testified that a new patient should take a normal dose of oxycodone only every four hours, and should take an extended release pill only every twelve hours. (Tr. at 43.)

10

have a different adverse effect on them than if a person is an addict and sustains their habit with large amounts of drugs." (Id.)  SA Mueller also testified that someone who has taken oxycodone should not drive or operate heavy machinery and that an overdose of oxycodone could be lethal, and could cause suppressed respiration and slow thinking.  (Id. at 30, 42-43.)

According to SA Mueller, Defendant was responsive, alert, awake, and "obviously acting confused, maybe sullen that law enforcement was in his house." (Tr. at 30-31.) SA Mueller testified that Defendant did not appear intoxicated, did not slur his speech, was consistently conscious, did not fall asleep, did not pass out, and was able to comprehend what was being said and focus on the questions asked. (Id.

at 31, 52, 54.) According to SA Mueller, Defendant and Mrs. Alvarez appeared to be in poor physical condition, and Defendant complained in general terms that he was not feeling well and stated that he thought he was passing a kidney stone. (Id. at 40, 73.) Defendant, however, never asked SA Mueller to stop questioning him due to pain. (Id. at 52.) According to SA Mueller, Defendant's pain did not appear to interfere with his ability to answer questions. (Id.) Defendant did not ask for medical attention, and was not writhing in pain, doubled over, visibly shaken, or frightened; instead, he merely remained in the recliner. (Id. at 52-53, 63.)

SA Mueller introduced himself to Defendant and Mrs. Alvarez, and immediately asked Defendant if there was any

12

methamphetamine in the Residence. (Tr. at 29, 43.) Defendant replied that there was not. (Id.) SA Mueller turned to SA Shelton and asked if Defendant and his wife had been Mirandized, and SA Shelton responded affirmatively. (Id.) SA Mueller briefly spoke with Defendant, who was alert and responsive, and also interacted with Mrs. Alvarez. (Id. at 32.) Defendant did not ask SA Mueller to repeat himself. (Id.) Regarding that conversation, SA Mueller testified as follows: "I reemphasized certain points, but I didn't have to say things again because he didn't understand me or didn't hear me." (Id.)

During the course of their conversation, Defendant told SA Mueller that Defendant was "bad with last names." (Tr. at 44.) SA Mueller believed that Defendant was not being

13

truthful as to whether he knew certain individuals. (Id. at 32.) Because Mrs. Alvarez was being more forthright, SA Mueller separated the two for additional questioning, moving Mrs. Defendant to an adjoining room eight to ten feet behind the place where Defendant was seated. (Id. at 32-34, 48.)

When SA Mueller resumed questioning Defendant, SA Mueller commented about a specific detail of the investigation. (Tr. at 34, 49.) Defendant responded to that comment and then requested an attorney. (Id.) SA Mueller stopped questioning Defendant, brought Mrs. Alvarez back into the living room of the Residence, and made a telephone call. (Id. at 34.) Defendant remained in the living room for approximately one hour before being transported to the Walker County Sheriff's Office at 8:30 a.m. (Id. at 34-

35, 50, 64-65.) Law enforcement asked Defendant no further investigative questions during that time. (Id. at 35.)

No threats or promises were made to Defendant or Mrs. Alvarez during the above events, and they were not yelled at or treated inhumanely. (Tr. at 17-18, 34, 36-37.) Additionally, during the course of the above interactions, Defendant requested a T-shirt and a Zantac. (Id. at 35-36, 46, 51-52.) SA Mueller complied with those requests. (Id. at 36, 46, 52.)

## C. Defendant's Statements While Being Transported

On June 30, 2010, at approximately 3:00 p.m., Deputy Brown transported Defendant from the Walker County Sheriff's Office to the Floyd County Jail. (Tr. at 35, 64-65,

74.)[7]  Deputy Brown handcuffed Defendant in the front and

placed him into a patrol car for the fifty-minute drive. (Id. at

65-66, 74.) During the drive, Deputy Brown and Defendant

were separated by a metal screen between the patrol car's

front and rear seats. (Id. at 66.)

Ten minutes into the drive, Defendant began making

unsolicited, unprompted statements to Deputy Brown every

five to eight minutes. (Tr. at 67, 69.)[8]  Defendant asked

Deputy Brown about Mrs. Alvarez, his animals, other

people, and his property. (Id. at 67, 69, 74-75.) Defendant

also referenced another patrol car driving six to seven car

---

[7]SA Mueller instructed Deputy Brown to transport Defendant
to the Floyd County Jail because the DEA has a contract with the
Floyd County Jail to house federal defendants. (Tr. at 35, 65.)

[8]Police radio traffic was audible during the drive; however,
information coming over the radio did not prompt Defendant's
comments. (Tr. at 67.)

lengths ahead of Deputy Brown. (Id. at 68.) Deputy Brown answered Defendant's questions, but did not re-Mirandize him. (Id. at 74-75.) During the trip, Defendant asked Deputy Brown if he had gone to "Gerald's" house, and Deputy Brown responded, "Gerald who?" (Id. at 76-78.)

Deputy Brown characterized Defendant's demeanor during the drive as curious, and testified that Defendant did not appear intoxicated, ill, sick, or sleepy. (Tr. at 68-69.) During the trip, however, Defendant alternated between sitting and lying on the back seat. (Id. at 74.) Additionally, while transporting Defendant, Deputy Brown did not point a firearm at him, drive erratically, threaten or yell at him, make any promises to him, treat him inhumanely, or ask him additional questions. (Id. at 68-70.)

17

## D. Procedural Background

On July 20, 2010, a federal grand jury sitting in the Northern District of Georgia returned a five-count Indictment with a forfeiture provision against Defendant and a co-defendant, Jesse Wilburn Peardon, concerning conduct allegedly occurring in this District.[9] Count One alleged that, at least by June 1, 2005, and continuing up to and including June 30, 2010, Defendant and Mr. Peardon knowingly conspired to possess with intent to distribute oxycodone, in violation of 21 U.S.C. §§ 841(a)(1), 841(b)(1)(C), and 846. (Indictment Count One.) Count Three charged that, on or about May 27, 2010, the co-defendants, aided and abetted

---

[9]Counts Two and Five of the Indictment only concern Defendant Peardon, and therefore are not relevant to Defendant or to Defendant's Motion to Suppress Statements. (Indictment Counts Two & Five.)

by each other, knowingly distributed oxycodone, in violation of 18 U.S.C. § 2 and 21 U.S.C. §§ 841(a)(1), 841(b)(1)(C), and 846. (Id. Count Three.) Finally, Count Four charged that, on or about June 15, 2010, Defendant and Mr. Peardon, aided and abetted by each other, knowingly distributed oxycodone, in violation of 18 U.S.C. § 2 and 21 U.S.C. §§ 841(a)(1), 841(b)(1)(C), and 846. (Id. Count Four.)

On February 1, 2011, a federal grand jury sitting in the Northern District of Georgia returned a First Superseding Indictment against Defendant and twelve co-defendants. (Docket Entry No. 53.) Count One of the First Superseding Indictment charges Defendant and his co-defendants with conspiring to possess with intent to distribute oxycodone, in

violation of 21 U.S.C. §§ 841(a)(1), 841(b)(1)(C), and 846. (First Superseding Indictment Count One.) Count Three of the First Superseding Indictment charges Defendant and Mr. Peardon with knowingly distributing oxycodone, in violation of 21 U.S.C. §§ 841(a)(1), 841(b)(1)(C), and 846 and 18 U.S.C. § 2, on or about May 27, 2010. (Id. Count Three.) Count Four of the First Superseding Indictment charges that Defendant and Mr. Peardon knowingly distributed oxycodone on or about June 15, 2010, in violation of 18 U.S.C. § 2 and 21 U.S.C. §§ 841(a)(1), 841(b)(1)(C), and 846. (Id. Count Four.) Count Eleven of the First Superseding Indictment charges Defendant and his co-defendants with money laundering, in violation of 18 U.S.C. § 1956. (Id. Count Eleven.) The First Superseding

20

Indictment also contains a forfeiture provision. (Id. Forfeiture Provision.)[10]

On August 27, 2010, Defendant filed a Motion to Suppress Statements. (Docket Entry No. 33.) On November 10, 2010, Judge Johnson held an evidentiary hearing concerning the Motion to Suppress Statements. (Docket Entry No. 43.)

On February 4, 2011, Judge Johnson issued his Non-Final Report and Recommendation. (Docket Entry No. 114.) Judge Johnson recommends that the Court deny the Motion to Suppress Statements. (Id.)

---

[10]Counts Two, Five, Six, Seven, Eight, Nine, and Ten of the First Superseding Indictment do not involve alleged criminal conduct by Defendant, and consequently are not material for purposes of the instant Motion.

Defendant has filed Objections to the Non-Final Report and Recommendation. (Docket Entry No. 120.) The Court finds that no response to the Objections from the Government is necessary, and concludes that this matter is ripe for resolution by the Court.

## II. Discussion

### A. General Standards Governing Admissibility of a Defendant's Statements

Before a jury may hear evidence of a defendant's confession or self incriminating statements, a defendant has a constitutional right to a fair hearing and to an independent and reliable determination of the voluntariness of those statements. Jackson v. Denno, 378 U.S. 368, 376-77 (1964). "[T]he trial judge shall, out of the presence of the

22

jury, determine any issue as to voluntariness." United States v. Davidson, 768 F.2d 1266, 1270 n.1 (11th Cir. 1985) (explaining that 18 U.S.C. § 3501(a) codified Jackson v. Denno requirement for criminal prosecutions).

In Miranda v. Arizona, 384 U.S. 436 (1966), the Supreme Court noted that, "when an individual is taken into custody or otherwise deprived of his freedom by the authorities in any significant way and is subjected to questioning, the privilege against self-incrimination is jeopardized." 384 U.S. at 478. The Court consequently held that the procedural safeguard of warning the suspect of his constitutional rights must be instituted to protect the privilege. Id. at 478-79. Those so-called Miranda warnings "are required before any statement may be admitted into

23

evidence at trial which was elicited from a person in custody through interrogation." Endress v. Dugger, 880 F.2d 1244, 1248 (11th Cir. 1989). When determining whether a confession or self-incriminating statement is admissible because of a defendant's waiver of his Miranda rights, a court must conduct a two-part inquiry. A Miranda waiver is valid only if the totality of the circumstances show both of the following: (1) an uncoerced choice and (2) an awareness "of both the nature of the right being abandoned and the consequences of the decision to abandon it." Moran v. Burbine, 475 U.S. 412, 421 (1986).

Even if the Government has complied with Miranda's requirements, the Court also must consider whether the confession or self-incriminating statement was voluntary.

24

United States v. Jones, 32 F.3d 1512, 1516 (11th Cir. 1994) (per curiam); United States v. Sims, 719 F.2d 375, 378 (11th Cir. 1983) (per curiam). When determining whether statements were voluntary, the Court examines the "totality of the circumstances, including the details of the interrogation and the defendant's characteristics." United States v. Bernal-Benitez, 594 F.3d 1303, 1319 (11th Cir. 2010). The goal of that inquiry is to determine whether police overreached, considering factors such as "the [accused's] lack of education, or his low intelligence, the lack of any advice to the accused of his constitutional rights, the length of detention, the repeated and prolonged nature of the questioning, and the use of physical punishment such

as the deprivation of food or sleep." Id. (internal quotations and citations omitted) (alteration in original).

Voluntary incriminating statements that are not made in response to custodial interrogation,[11] however, are admissible. Innis, 446 U.S. at 299-300; United States v. Canela, 144 F. App'x 17, 22 (11th Cir. 2005) (per curiam); United States v. Suggs, 755 F.2d 1538, 1541 (11th Cir. 1985). Similarly, Miranda is not implicated where an officer responds to a defendant's voluntary statement by asking for clarification. United States v. Villegas-Tello, 319 F. App'x 871, 875-76 (11th Cir. 2009) (per curiam).

_____

[11]"Interrogation" is defined as express questioning or the functional equivalent—"any words or actions on the part of the police . . . that the police should know are reasonably likely to elicit an incriminating response." Rhode Island v. Innis, 446 U.S. 291, 300-01 (1980).

26

## B.   Discussion

The Court first determines whether Defendant knowingly and intelligently waived his Miranda rights and whether Defendant's subsequent statements to police that he made at the Residence were voluntary. The Court then examines whether Defendant's later statements, which he made while in transit to the Floyd County Jail, were voluntary or resulted from additional interrogation by Deputy Brown.

### 1.   Defendant's Miranda Waiver and Statements At the Residence

The Court agrees with Judge Johnson that "the first Miranda prong was satisfied." (Non-Final Report and Recommendation at 15.) As Judge Johnson noted,

Defendant does not argue that law enforcement failed to give him a Miranda warning or that his waiver was coerced. (Id.)[12] Instead, Defendant contends that the second prong was not met because Defendant could not have knowingly and intelligently waived his rights while under the influence of drugs and in pain. For those same reasons, Defendant also argues that his subsequent statements made in the Residence were involuntary.

_____

[12]As Judge Johnson observed, the hearing testimony supports a finding that the first Miranda prong was satisfied. (Non-Final Report & Recommendation at 15 n.11.) The testimony reflects that, prior to any questioning, SA Shelton orally provided a Miranda warning to Defendant and summarized the Miranda rights in plain language in the presence of Deputy Brown. (Tr. at 14-16, 63-64.) The testimony also indicates that no officer made any threats or promises to Defendant, yelled at him or treated him inhumanely, or brandished a weapon after the Residence was secured. (Id. at 9, 14-18, 34, 36-37.)

28

As Judge Johnson observed: "The test of whether a person is too affected by alcohol, drugs, or pain to voluntarily and intelligently waive his Miranda rights is one of coherence and an understanding of what is happening." (Non-Final Report & Recommendation at 16 (collecting cases).) Notwithstanding Defendant's Objections, the Court agrees with Judge Johnson that, "despite [Defendant]'s ingestion of oxycodone the previous night and his pain, the hearing testimony supports a finding that he was coherent and cognizant of the situation when he waived his Miranda rights and spoke with SA Mueller." (Id.) As Judge Johnson observed:

> [Defendant] was alert and awake when the officers entered his home at 7:00 a.m. on June 30, 2010, opening the back door of the [R]esidence as officers approached. After being moved to the

29

living room, [Defendant] asked SA Shelton in a polite, conversational manner what was going on, what the officers were looking for, and why they came to his home. (See Tr. 13, 18, 57-61, 62-63, 71.) Although the hearing testimony revealed that [Defendant] was in poor physical health, he was consistently conscious and did not appear intoxicated, slur his speech, fall asleep, or pass out. (Id. at 13, 31, 40, 52, 54, 73.)

Moreover, after SA Shelton administered the Miranda rights, [Defendant] stated that he understood his rights and repeated his desire to "know what's going on." (Tr. 15-16.) [Defendant]'s express oral statement waiving those rights is "strong proof of the validity of that waiver." See North Carolina v. Butler, 411 U.S. 369, 373 (1979). Likewise, when SA Mueller arrived ten to twenty minutes later, [Defendant] was able to focus on the questions asked and to respond with coherent answers. (Tr. 31, 52, 54.) Although [Defendant] complained in general terms that he was not feeling well and thought that he was passing a kidney stone, he did not ask SA Mueller to stop the questioning or request medical attention. (Id. at 40, 52-53, 63, 73.) Rather, he asked for a T-shirt and a Zantac, both of which SA Mueller gave to [Defendant]. (Id. at 35-36, 46, 51-

52.) Moreover, after conversing with SA Mueller for approximately ten minutes, [Defendant] invoked his right to counsel and stopped the interrogation. (Id. at 34, 49.)

The undersigned accepts SA Mueller's testimony that narcotics have varying effects on people depending on their individual drug history. (See Tr. 30.)  However, there is no probative evidence that [Defendant's] statements were involuntary.   Without more, [Defendant's] contention that he ingested oxycodone the previous evening and was in pain does not invalidate his Miranda waiver or make his subsequent statements involuntary.  Indeed, by invoking his right to remain silent and his right to counsel, [Defendant] demonstrated that he understood the Miranda warning and was cognizant of the situation, ending his conversation with SA Mueller when it suited him.

(Id. at 16-18.)

The Court agrees with Judge Johnson's reasoning and

findings, and concludes that, considering the totality of the

circumstances, Defendant made a knowing, voluntary, and

intelligent waiver of his Miranda rights, followed by voluntary statements to SA Mueller at the Residence. The Court therefore adopts this portion of the Non-Final Report and Recommendation, overrules Defendant's corresponding Objections, and denies Defendant's Motion to Suppress Statements with respect to the statements made at the Residence.

## 2. Defendant's Statements While in Transit

After the officers took Defendant into custody, Deputy Brown transported Defendant from the Walker County Sheriff's Office to the Floyd County Jail, a fifty-minute drive. (Tr. at 35, 64-65, 74.) During that time, Defendant repeatedly made unsolicited statements to, and voluntarily asked questions of, Deputy Brown, and Deputy Brown

answered Defendant's question. (Id. at 67, 69, 74-75.) At some point, Defendant asked Deputy Brown if the officers had gone to "Gerald's" house. (Id. at 76-78.) Deputy Brown responded by asking Defendant, "Gerald who?" (Id.)

Notwithstanding Defendant's Objections, the Court agrees with Judge Johnson that the statements made by Defendant while he was in transit to the Floyd County Jail are admissible. As Judge Johnson noted, "[t]here is no dispute that [Defendant] was in custody at the time and that he had invoked his right to remain silent and to counsel." (Non-Final Report & Recommendation at 19.) As Judge Johnson recognized, however, "voluntary comments in the absence of, or unresponsive to, law enforcement questioning are admissible even after Miranda rights are

asserted." (Id.) The Court agrees with Judge Johnson that

Defendant's "post-arrest statements and questions were

spontaneous and not in response to interrogation by Deputy

Brown." (Id.) The Court further agrees with Judge

Johnson's observation that:

> Deputy Brown's single question–'Gerald
> who?'–cannot be characterized as an interrogation
> or an attempt to elicit an incriminating response
> from [Defendant]. Rather, it appears to be a
> reflexive follow-up question asked for the sake of
> clarification. The Eleventh Circuit has held that
> Miranda does not reach such situations.

(Id. at 19-20 (collecting cases).) Judge Johnson therefore

properly determined that the statements Defendant made

while in transit to the Floyd County Jail were admissible.

For the reasons discussed above, the Court agrees

with Judge Johnson that the statements Defendant made

while in transit to the Floyd County Jail were admissible. The Court therefore adopts this portion of the Non-Final Report and Recommendation, overrules Defendant's corresponding Objections, and denies this portion of the Motion to Suppress Statements.

## III. Conclusion

ACCORDINGLY, the Court **ADOPTS** the Non-Final Report and Recommendation of United States Magistrate Judge Walter E. Johnson [114], **OVERRULES** Defendant's Objections to the Non-Final Report and Recommendation [120], and **DENIES** Defendant's Motion to Suppress Statements [33].

IT IS SO ORDERED, this the _12_ day of February, 2011.

_____

UNITED STATES DISTRICT JUDGE